UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
BERNARD H. COHEN,

                        Plaintiff,                 05 CIV 3633 (WCC)

     -against-                    **FIRST AMENDED COMPLAINT**

MIDDLETOWN ENLARGED CITY SCHOOL      **JURY TRIAL DEMANDED**
DISTRICT, ROBIN MARKOVITS, former Board of
Education President, PAUL JOHNSON, former Board of      ECF Case
Education President, VINCENT CRESCENZO, Board of
Education President, ROBERT SIGLER, former
Superintendent of Schools, PATRICIA MCLEOD,
former Superintendent of Schools, and KENNETH
EASTWOOD, Superintendent of Schools,
sued in their individual capacities,

                       Defendants.
-----------------------------------------------------------------X

      By and through his counsel, Thornton, Bergstein & Ullrich LLP, plaintiff complains of

defendants as follows:

    I.    **INTRODUCTION**

    1.  Plaintiff Bernard H. Cohen brings suit to redress the violation of his rights under the

First and Fourteenth Amendments of the United States Constitution and New York state law.

    II.    **PARTIES**

    2.  Plaintiff resides in the County of Rockland, State of New York, within this judicial

district.

    3.  Defendant Middletown Enlarged City School District is a public School District

organized pursuant to the laws of the State of New York.  It may sue and be sued.

    4.  Defendant Robin Markovits served as President of the Board of Education of the

District from in or about June 2002 through June 2004, and prior to that was a Board member.

Her actions in this matter were taken under color of State law.

5.  Defendant Paul Johnson was the District's President of the Board of Education until in or about June 2002; prior to and for one year after that he was a Board member. His actions in this matter were taken under color of State law.

6.  Defendant Vincent Crescenzo has served as President of the Board of Education from in or about June 2004 to present, and prior to that was a Board member.   His actions in this matter were taken under color of State law.

7.  Defendant Robert Sigler was the District's Superintendent of Schools from in or about 1994 to January 8, 2003, when he was arrested, and subsequently convicted, on charges of child molestation.  His actions in this matter were taken under color of State law.

8.  Defendant Patricia McLeod was Acting Superintendent of Schools from January 9, 2003 through in or about February 2004, when she resigned.  At all prior relevant times, she was the District's Assistant Superintendent for Instruction.  Her actions in this matter were taken under color of State law.

9.  Defendant Kenneth Eastwood has been the District's Superintendent of Schools from July 1, 2004 to present. His actions in this matter were taken under color of State law.

## II.  JURISDICTION

10.  This Honorable Court has jurisdiction over this action pursuant to 28 U.S.C. secs. 1331, 1343 (3) and (4) and 1367 and 42 U.S.C. secs 1983 and 1988.  This Court has jurisdiction over the related state claims which arise from the same nucleus of operative facts as the federal causes of action.

2

III.     **FACTUAL AVERMENTS**

A.     **Sigler's Relationship with A.G. and Plaintiff's Reporting of His Concerns**

11.  Plaintiff Bernard Cohen is 62 years old and has been employed in the field of education for the past 39 years.  He holds Master's Degrees from Columbia University in Education (Psychology) and the City College of New York in Education Administration.

12.  In October 1997, plaintiff  became Principal of Middletown High School 1997.  The Superintendent of Schools was defendant Robert Sigler.  Prior to 1997, plaintiff was a successful administrator in the New York City school system.

13.  In Spring 2001, plaintiff began to hear reports from staff members that Sigler was engaged in an inappropriate relationship with a male eighth-grade student at Twin Towers Middle School. Based on these reports, Plaintiff contacted the principal at Twin Towers, Gordon Dean, who confirmed that Sigler appeared to have an inappropriate relationship with a student named "A.G."  When plaintiff urged Dean to take some action concerning this relationship, Dean responded that he lacked any authority to do so.

14. Plaintiff next confronted Sigler directly about his relationship with A.G.  Sigler confirmed that he bought A.G. gifts and spent a lot of time with him, but rationalized his behavior by referring to himself as a surrogate father for A.G.  Plaintiff advised Sigler that he should cease his relationship with the student, because several people had raised concerns about its propriety.  The Superintendent dismissed these concerns as "small-mindedness," and indicated that he would not end the relationship.

15.  After this discussion with Sigler, in Spring 2001, plaintiff contacted Sergeant Green of the City of Middletown Police Department to report his concerns about Sigler's relationship

with A.G.  Green confirmed that he had received "anonymous" reports about the relationship and said the police department would investigate the matter.

16.  Thereafter, in Spring and Summer 2001, Plaintiff maintained contact with Sergeant Green about Sigler's inappropriate relationship.  Green advised plaintiff that he had commenced an investigation into the matter, and further advised that he did not want anything placed in writing concerning the investigation out of concerns that details would leak out given Sigler's high profile within the community.

17.  In September 2001, A.G. entered the High School as a freshman, where he was extremely disruptive with teachers, staff and other students.  However, Sigler repeatedly intervened on A.G.'s behalf by removing him from disciplinary placement and, at times, removing him from the building.

18.  During Fall 2001, plaintiff continued to maintain contact with the Middletown Police Department concerning Sigler's relationship with A.G.  In addition, in or about late September 2001, he shared his concerns about the relationship with A.G.'s father, who said he was also concerned about the relationship, but that A.G. insisted that there was nothing sexual about it and that Sigler was simply  "mentoring" him.

19.  In or about November 2001, plaintiff told his direct supervisor, Assistant Superintendent for Instruction, Patricia McLeod, that he and others at the High School were concerned about Sigler's relationship with A.G.  McLeod agreed that there was reason to be concerned, and added that A.G. was often at the School District's administrative offices with the Superintendent after school hours.  However, she stated, "What can we do, Bern?  He's the Superintendent."

4

20.  After speaking with McLeod, plaintiff again spoke with Sigler about his relationship with A.G., and the widespread perception that it was not appropriate.  Sigler substantiated McLeod's observation that A.G. was often in his office after school hours.  Plaintiff also advised Sigler that it appeared that A.G.'s disruptive behaviors had increased as a way to get Sigler's attention.  While Sigler again responded that the relationship was a "mentoring" one, he also told plaintiff that A.G. was spending time at his house on weekends.  Sigler further told plaintiff that A.G. was not gay, and he knew this because A.G. had graphically described to him a recent sexual encounter with a girl.  Sigler also informed plaintiff that his own therapist had urged him to separate from A.G.  Plaintiff told the Superintendent that his relationship with A.G. could be a "career buster."  Sigler said he was trying to separate himself from A.G.  Plaintiff reported this conversation to Sgt. Green, including the fact that, according to Sigler, A.G. had described a sexual encounter to him in graphic detail.

21.  In early 2002, plaintiff went to the professional office of the Board of Education President, Dr. Paul Johnson, a veterinarian.  He handed Johnson a memorandum outlining his concerns about the Superintendent's relationship with A.G.  After reading and handing back the memorandum, Johnson assured plaintiff that he would take immediate action.  He also told plaintiff that he and Board of Education Vice-President Robin Markovits had already spoken with Sigler about his relationship with A.G. in October or November 2001.

22.  Despite Johnson's assurance, the Board of Education took no action for several weeks, and Sigler maintained contact with A.G.  Plaintiff approached McLeod again about his concerns and the concerns of many at the High School.  She responded that plaintiff did not "know the half of it," as A.G. was constantly at the central administration's offices, called the

5

Superintendent "Bob," and referred to other administrators by their first names. McLeod also recounted that at a birthday party for Sigler, District administrator Timothy Conway made a joke about Sigler kissing A.G.

23. In or about March 2002, plaintiff and A.G.'s school psychologist, Dr. Robert Stein, confronted Sigler about A.G., telling him that several people at Middletown High School believed he was "in the boy's pants." Stein asked Sigler whose needs were being met by his actions toward A.G. Sigler stated that he knew he should be separating from A.G.

24. After this confrontation, plaintiff telephoned Johnson and informed him that several teachers and staff members at the High School planned to attend the next Board of Education meeting to publicly protest Sigler's relationship with A.G. Plaintiff told Johnson that nothing had changed since Johnson had assured him in early January that he would take action.

25. Johnson went to the High School that afternoon. He met with plaintiff and Stein, who were blunt about their mutual concerns that Sigler's relationship with A.G. was inappropriate and potentially sexual. Johnson urged Stein and plaintiff to prevent staff and teachers from attending the Board meeting and assured them that he would take immediate action. Stein then called off that plan of action.

26. The next day, Johnson told plaintiff he had been meeting with the District's lawyers all day and they had prepared a "mechanism" that would end the Superintendent's relationship with A.G.

27. Shortly after this, Sigler yelled at plaintiff for getting him "in trouble" with Johnson and Markovits. Thereafter, Sigler began to regularly criticize and berate plaintiff in front of others. Viewing plaintiff as a threat to his relationship with A.G., Sigler determined to try to

6

remove plaintiff from his position, and enlisted the support of Board President Johnson and Vice-President Markovits.  To retaliate against plaintiff, Sigler proposed that the District bring charges against him for creating a hostile work environment, changing Regents grades and improperly accusing the Superintendent of misconduct with A.G.

28.  Because A.G. continued to engage in disruptive and self-destructive behaviors at the High School, plaintiff recommended his transfer to Flannery, a high school for emotionally challenged Special Education Students run by BOCES.  The High School's Special Education Chair, Tracy Sorrentino, concurred with this recommendation.  However, acting on behalf of Sigler, Selena Fischer, the District's Director of Special Services, opposed A.G.'s transfer. Plaintiff bluntly told Fischer that if she blocked A.G.'s transfer, then she was in the Superintendent's pocket.  Although she ultimately approved A.G.'s transfer, Fischer attempted to allow Sigler to accompany A.G. on a tour of Flannery, despite knowing that Sigler was prohibited from having contact with A.G.  Fischer also subsequently arranged for A.G. to meet with Sigler and speak with him by telephone.

29.  Sigler maintained contact with A.G. after he began attending Flannery High School, and some of that contact was known by certain School Board members, including Johnson and Markovits.  Nonetheless, the Board voted to give Sigler a contract extension and pay raise.

**B.      Sigler's Arrest and the Commencement of a Grand Jury Investigation**

30.  On January 8, 2003, Sigler was arrested and charged with having sexual relations with a minor based on his relationship with A.G.  Sigler's arrest and the underlying charges were nationally reported and caused the School District widespread notoriety.  The Board of Education suspended Sigler and appointed Patricia McLeod as Acting Superintendent.

31. McLeod immediately directed District employees not to speak with the media about the Sigler matter. In addition, she and Markovits falsely asserted they had no information which might have aroused suspicion of a potential sexual relationship between Sigler and a student. Knowing this was false, plaintiff realized that District officials intended to cover up the extent and scope of their knowledge about the relationship.

32. Shortly after Sigler's arrest, the media reported that, in the year preceding the arrest, the Board of Education had secretly admonished Sigler for his relationship with A.G. but nonetheless gave him a contract extension and raise. After an outcry from the Middletown community and a petition to remove School Board members, the School District hired Alan Levine, Esq., at a rate of $375 per hour, to "investigate" its role in the Sigler matter.

33. In early February 2003, concerned that he might be retaliated against by District officials for truthfully revealing "who knew what and when" concerning the Sigler matter, plaintiff retained private counsel to represent his interests. When the School District's attorney, Levine, requested to meet with plaintiff as part of his "investigation," plaintiff's attorneys informed him in writing that plaintiff had a conflict of interest with certain School District officials, particularly in any civil suit by A.G. and his family. Plaintiff's attorneys also wrote that plaintiff would only meet with Levine if Levine gave assurances in writing that the District would not be using his "investigation" as part of a defense in the boy's anticipated civil suit. Levine indicated he could not give any such assurance.

34. In February 2003, the Orange County District Attorney announced that he was convening a Grand Jury to investigate how District personnel and officials had handled the Sigler matter. Shortly thereafter, plaintiff was subpoenaed to testify. When he arrived, plaintiff

found Levine waiting outside the Grand Jury room.  Levine confronted plaintiff during a break in

his testimony, telling him that he had been reaching out to his attorneys and they had not been

cooperative, and that he wanted to talk to plaintiff regarding the Sigler matter as soon as

possible.  Plaintiff reported this interaction to the District Attorney's office.  Based upon this and

other events, the District Attorney requested that Levine stop his "investigation" because it was

creating a climate of fear and intimidation among witnesses testifying before the Grand Jury.

The District Attorney's "cease and desist" letter to Levine was reported on by the *Times Herald*

*Record,* the area's leading newspaper, and the letter was published verbatim in the paper's on-

line version.

35.  On March 25, 2003, attorneys for A.G. and his father publicly announced that they

had filed a $61 million Notice of Claim against the School District and various officials,

including McLeod, Johnson, Markovits and plaintiff, in connection with the Sigler matter.

**C.      McLeod's False Allegations and the District's "Investigation" of Plaintiff**

36.  On March 31, 2003, McLeod publicly announced to the High School's entire staff

and faculty that she was commencing an investigation of plaintiff based on "anonymous"

allegations that he had stolen petty cash, changed grades for favors, intimidated staff, and created

a hostile work environment.   McLeod's highly unusual public announcement of these false

allegations evinced malice and an intent to punish and taint plaintiff, thereby undermining his

credibility and authority.  Moreover, although the District ultimately found that there had been

no basis to accuse plaintiff of having stolen money, neither McLeod nor anyone else from the

District ever retracted this allegation or issued any apology for having falsely publicly suggested

that plaintiff was a thief.

9

37.  On April 1, 2003, in a story titled, "New Middletown Target: High School Principal," the *Times Herald Record* reported on McLeod's public announcement of false allegations against plaintiff and the District's commencement of an investigation into same.

38.  After McLeod's baseless allegations were reported on by the news media, plaintiff spoke out publicly about Sigler's relationship with A.G., the extent of the knowledge of certain District officials about the relationship and what plaintiff perceived to be a campaign of retaliation against him because of his refusal to go along with their cover-up.  On April 2, 2003, plaintiff's statements were reported by the *Times Herald Record* and local television newscasts.

39.  For nine months, from April 1 through early December 2003, the School District performed a far-reaching investigation of plaintiff.  The investigation extended well beyond the initial "anonymous" allegations announced by McLeod.  The District, cash-strapped and trying to recover from the Sigler debacle, spent countless personnel hours and over a hundred thousand dollars to find something with which to charge plaintiff, even falsely suggesting at one point during the investigation that he had stolen District equipment and requiring plaintiff to submit to a humiliating search of his office and closets in front of his staff.

40.  Defendants' purpose was manifest:  to punish, silence and taint plaintiff and send a message to other employees at the High School and within the School District that if they spoke out about the District's failings in the Sigler matter, defendants would use their power and the taxpayers' money to punish them.

41.  In July 2003, while the District was investigating plaintiff, Sigler pled guilty to sodomy and other charges.  He is currently serving out his sentence in state prison.

42.  In September 2003, McLeod removed plaintiff as the High School Evening Program

Principal, a separate position for which he was separately compensated.  Although plaintiff had

significantly improved a previously failing Evening Program, McLeod replaced him with Selena

Fischer, the same administrator who had facilitated contact between Sigler and A.G. after Sigler

had been told to "cease and desist" from contacting the boy.  In removing plaintiff, McLeod said

the investigation had placed a  "cloud" over him.

43. Although McLeod and Markovits both publicly stated in Spring 2003 that the

District's investigation of plaintiff had nothing to do with the Sigler matter, in late Fall 2003, the

investigation veered into plaintiff's actions regarding Sigler.

### D.     The District Charges Plaintiff and Removes Him as Principal

44.  On December 10, 2003, with the Grand Jury's report imminent, the School District

preferred disciplinary charges against plaintiff.  McLeod removed him from the High School and

"reassigned" him to work on various reports from home while the charges are pending.

45.  The disciplinary charges set forth the following specifications: (1) failing to make

mandatory reports regarding the relationship between Sigler and A.G.; (2) improperly

documenting changes to student grades on the June 2002 Math A Regents Examination; (3)

failing to ensure that instruction was provided by a licensed teacher for a GED I English Class

on one or more occasions during the 2002-03 school year; and (4) permitting a student to attend

a GED I program rather than a "special class" (as per her IEP) for approximately six weeks in

2003.

46.  On December 18, 2003, the Grand Jury publicly released its report, which identified

plaintiff, by position rather than name, as the only District employee or official to report Sigler's

conduct to the police.  It also found that plaintiff had alerted higher-level District officials of his

11

concerns, but that those officials did not take proper action. With the notable exception of plaintiff's reporting activity, the report notes a "complete breakdown of the leadership components within the District [which] resulted in a failure to protect the student in the District."

47.  Plaintiff has been singled out for punishment because he reported his concerns about the Sigler/A.G. relationship, and because of his knowledge, truthful testimony and speech about "who knew what" within the District concerning that relationship, all matters of the highest public concern.

48.  The disciplinary charges against plaintiff are unfounded, distorted and facially retaliatory.

49.  As to the first Charge, plaintiff properly notified the police with his concerns about Sigler's inappropriate relationship and notified both his direct supervisor, McLeod, and the Board of Education President, Johnson.  Moreover, during the relevant time – while Sigler was carrying on the improper relationship with A.G. and plaintiff was reporting his concerns about the relationship to District officials and the police – the District's internal policy for reporting suspected child abuse by district personnel was outdated and contrary to the law.  It failed to include the mandates of Education Law § 1126, et seq., which took effect on July 1, 2001 and requires that school district employees and officials (including Board of Education members) report allegations of suspected abuse to law enforcement.  The District did not change its policy to reflect the 2001 change in the Education Law until September 2003, long after Sigler's arrest and long after plaintiff is accused of having violated the law.  Moreover, plaintiff was the *only* District official or administrator to report concerns about Sigler's relationship with A.G. to any outside agency, including law enforcement.  As Board of Education members, Markovits and

Johnson had as much or more responsibility as plaintiff for reporting their concerns about Sigler – which they clearly had as demonstrated by their two secret letters to Sigler to cease and desist from having any contact with A.G – but they completely failed to report their concerns to any outside agency.   Instead, Markovits and Johnson sought to cover up Sigler's wrongdoing and agreed with Sigler that plaintiff should be punished for blowing the whistle on Sigler.

50.  As to the second Charge, consistent with District practice, plaintiff annually reviewed borderline Regents test scores to ensure that no student would fail due to inconsistent scoring, a practice known to and encouraged by Sigler and McLeod.  Moreover, the District never would have charged plaintiff with respect to the 2002 Math A Regents had he not engaged in the aforementioned protected activity.  As to the third and fourth charges, Fischer and the District's Personnel Director, Ellen Kaplan, were responsible for securing licensed GED I teachers, not plaintiff.  As to the fifth charge, Fischer was also responsible for ensuring compliance with IEP plans.  Moreover, the specific allegations underlying these charges facially lack substance and would never have been the subject of disciplinary charges had plaintiff not engaged in whistleblowing activity.

51.  The Education Law § 3020-a hearing on the disciplinary charges against plaintiff commenced in July 2004 and remains ongoing.

**E.      Eastwood's Defamatory Statements**

52.  Defendant Eastwood began as Superintendent on July 1, 2004.  Less than two weeks later, he was interviewed by the *Times Herald Record.*

53.  On July 12, 2004, the *Times Herald Record* published its interview with Eastwood in an article entitled "New Middletown Schools Boss Shares Views."  Eastwood equated plaintiff

13

with former Superintendent, Robert Sigler, who at the time of Eastwood's statements was a convicted child molester and notorious within the region for his heinous misdeeds.

54. Specifically, Eastwood maliciously and willfully defamed plaintiff by stating: *"We've become a society that's focused on the negative. . . .  The same as the Sigler situation and the Bernie Cohen situation.  Those are individuals and they are minorities of our total workforce and they do not reflect Middletown.  They reflect a clear, small population and we need to start focusing on everyone else. . . ."*

55. Eastwood's suggestion that plaintiff should be viewed in the same light as Sigler — a convicted child molester — was hurtful and intended to portray plaintiff as a person of loathsome moral character.  Eastwood made the comments willfully and, knowing they would be published in the newspaper, with the intention of damaging plaintiff's reputation.

56. Eastwood made the defamatory comments in his capacity as School Superintendent and, upon information and belief, with the condonation and approval of the School District.

57. As set forth herein, plaintiff has been retaliated against and selectively disciplined in violation his rights under the First and Fourteenth Amendment, through the actions of District officials with final policymaking authority with respect to personnel matters.

58. As set forth herein, defendants Eastwood and the Middletown City School District falsely and maliciously defamed plaintiff through the former's comments equating plaintiff with a convicted child molester, as published in the *Times Herald Record* on July 12, 2004.  In addition, Eastwood's pre-hearing comments about plaintiff violated the Fourteenth Amendment's due process clause, as they have stigmatized plaintiff personally and professionally.

14

59.  In addition, under the leadership of Sigler, Johnson, Markovits, McLeod, Crescenzo and Eastwood, the Middletown City School District has established a custom or policy of retaliating against and/or selectively disciplining District employees and volunteers for exercising their First Amendment rights and for other wrongful purpose.  This policy or custom has substantially caused the violations of plaintiff's Constitutional rights complained of herein.

60.  Moreover, in connection with the Sigler matter, through its elected and appointed leaders, the School District adopted an unconstitutional policy or custom of secrecy, distortion, cover-up, retaliation and vindictive attack concerning a matter of the utmost public importance. This policy or custom has substantially caused the violations of plaintiff's Constitutional rights.

61.  Through their malicious and reckless acts and omissions, defendants have maliciously and willfully caused plaintiff actual compensatory injuries, including lost pay and benefits, mental anguish, humiliation, embarrassment, and irreparable damage to his professional and personal reputation.

## IV.     CAUSES OF ACTION

62.  Plaintiff incorporates paras. 1-61 as if fully restated herein.

63.  By intentionally and/or recklessly publicly defaming plaintiff, investigating plaintiff, removing him from his position as Evening Program Principal, preferring disciplinary charges against plaintiff and removing him as Principal at the High School, all in retaliation for his speech and activity protected by the First Amendment, defendants have violated plaintiff's rights under the First and Fourteenth Amendments, as made actionable by 42 U.S.C. section 1983.

64.  By selectively investigating, disciplining and prosecuting plaintiff in retaliation for his speech and activity protected by the First Amendment and for other wrongful purpose, and

with malice, defendants have violated plaintiff's rights under the First and Fourteenth

Amendments, as made actionable by 42 U.S.C. section 1983.

64A.  Class of One Equal Protection Claim:  By treating plaintiff less favorably than

those to whom he was similarly situated in the material terms and conditions of his employment

– including by publicly announcing "anonymous," un-investigated allegations against him to his

faculty and staff, proffering disciplinary charges against him, prosecuting him administratively

and terminating his employment – defendants have violated plaintiff's rights under the Equal

Protection Clause of the Fourteenth Amendment to the United States Constitution, as made

actionable by 42 U.S.C. § 1983

65.  Defendants Eastwood and School District have defamed plaintiff in violation of New

York common law and violated his due process rights under the Fourteenth Amendment.

### V.    PRAYER FOR RELIEF

66.  WHEREFORE, plaintiff prays that this Honorable Court:

(a) empanel a jury to hear and decide this matter;

(b) award to plaintiff compensatory damages, including damages for lost pay and benefits and

past and future emotional distress, in the amount of $3,000,000 against the defendants jointly

and severally;

© award to plaintiff punitive damages against the individual defendants for their egregious

violations of plaintiff's rights which must be punished and deterred in the amount of $3,000,000;

(d) award to plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. section 1988,

and

(e) enter any other relief justified by the law and facts.

Dated: January 10, 2006
        Chester, New York

Respectfully submitted,

S/_____
Christopher D. Watkins (CW 2240)

THORNTON, BERGSTEIN & ULLRICH LLP
15 Railroad Ave.
Chester, New York 10918
(845) 469-1277
Attorneys for Plaintiff

17